IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Robertson Transformer Co.        )
d/b/a/ Robertson Worldwide,       )
                                  )
            Plaintiff,            )
                                  )
      v.                          )    No. 12 C 8094
                                  )
General Electric Company, et      )
al.                               )
                                  )
            Defendants.           )
                                  )

<u>MEMORANDUM OPINION AND ORDER (CORRECTED)</u>

On October 10, 2012, plaintiff sued General Electric
Company, GE Lighting, LLC, H.B. Etlin Company, Ltd., Hatch
Transformers, Inc., Howard Industries, Inc., Keystone
Technologies, LLC., and ARN Industries, Inc. (collectively, the
"Customer-Defendants"[1]), to enforce U.S. Patent Nos. 6,366,032
(the '032 Patent) and 6,420,838 (the '838 Patent) (collectively,
the Asserted Patents). These patents claim improvements to
electronic ballasts for fluorescent lamps, including multiple
start attempts, automatic restart after shutdown, and end-of-
life protection circuitry. Before me is plaintiff's motion for
summary judgment of no laches, equitable estoppel, or waiver —
three affirmative defenses defendants have raised in answer to

_____

[1] I follow the parties' lead in referring to these defendants as
the "Customer-Defendants," as each is a customer of intervening
defendant Super X.

plaintiff's claims of infringement. For the reasons that follow, I grant the motion.

I.

On September 18, 2015, I resolved a number of summary judgment motions brought by defendants, including one asserting an entitlement to judgment based on the equitable doctrines of laches, equitable estoppel, and waiver. In my decision denying that motion, I examined the evidence that defendants identified to support their argument that plaintiff knew as early as 2005 that Super X was selling the accused products to plaintiff's competitors and acquiesced in the sales, and I concluded that "much of it does not support, much less does it conclusively establish, that plaintiff knew Super X was selling *accused* products (as opposed to other products not covered by the asserted patents) to third parties *for resale in the United States* (as opposed to in geographic regions outside the scope of plaintiff's patent protection)." DN 332 at 2 (original emphasis). In other words, I determined that while plaintiff undisputedly knew that Super X was selling some products to plaintiff's competitors in the U.S. market at that time, and may have known that Super X was selling the accused products to third parties, the evidence to which defendants pointed did not inform plaintiff of all of the facts it would have needed to put

them on notice that defendants were infringing the asserted patents.

I illustrated the point with specific examples of the shortcomings in defendants' evidence. *See* 9/18/2015 Order, DN 332 at 2-3 (citing Lovsin Decl., Exhs 6, 7, 29, 30, DN 184-1). I then pointed to affirmative evidence tending to show that plaintiff did *not* know about defendants' allegedly infringing activities at any point before 2009. *Id.* at 3-4 (citing Bezdon Decl. ¶ 22, DN 185-2, and Hartsell Decl., Exhs. 105, DN 262-13 and 143, DN 263-7). I further explained that undisputed evidence that the parties discussed an arrangement in which defendants would sell plaintiff's patented products to others in exchange for royalties was inconsistent with defendants' assertion that plaintiff granted Super X permission to sell the accused products, royalty-free, to plaintiff's competitors in the U.S. market. 9/18/15 Order, at 4-5. Finally, I determined that evidence of plaintiff's assistance to Super X in a "multiple listing" process did not establish that plaintiff knew or should have known about the allegedly infringing activity prior to 2008 or 2009. 9/18/2015 Order, DN 332 at 5-6.

In addition to identifying these "fundamental shortcoming[s]" in defendants' proof on the issue of when plaintiff knew or should have known about Super X's infringing activities, I noted that several of defendants' arguments

overstated, mischaracterized, or were otherwise estranged from the factual record. For all of these reasons, I concluded that defendants had not established their entitlement to summary judgment based on any of the equitable defenses they assert.

Now before me is plaintiff's motion for summary judgment of no laches, estoppel, or waiver, which requires me to return to the evidence I previously examined, and to consider it through a somewhat different lens. To deny defendants' motion, which was premised on "Robertson's actual knowledge of Super X's offers for sale of the Accused Products to other Super X customers for more than 6 years before filing suit," Def. Mem. at 20 (DN 176-1), I had only to determine that some admissible, material evidence supported plaintiff's claim that it did *not* know about Super X's infringement until several years after defendants claimed (i.e., that there is a genuine dispute over when plaintiff discovered the infringement), since that factual dispute alone precluded the determination, as a matter of law, that the delay between the time plaintiff discovered its claim against defendants and the time it filed suit was unreasonable and unexcused.[2] To resolve plaintiff's summary judgment motion on

---

[2] As explained below, a delay of more than six years to file suit after a patentee discovering its claim against an alleged infringer is presumptively unreasonable and prejudicial. *See Wanlass v. General Electric Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998). Absent this presumption, a defendant must affirmatively establish that the patentee's delay was unreasonable and that

4

the same issue, however, I must determine whether, viewing all of the evidence in the light most favorable to defendants, it is possible to conclude the contrary: that plaintiff unreasonably and unjustifiably delayed filing suit after discovering their claim, and that defendants were materially prejudiced as a result. Before proceeding to the evidence, however, I set forth the legal framework that guides my analysis.

II.

In *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) (en banc), the Federal Circuit held that the equitable defense of laches may be invoked to defeat a claim of patent infringement, and that to prevail on this defense, the defendant must show that "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and...the delay operated to the prejudice or injury of the defendant." *Id*. at 1032 (citations omitted). Although laches has long been recognized as a defense to patent infringement, *see Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp*., 60 F.3d 770, 773 (Fed. Cir. 1995), the Supreme Court's decision in *Petrella v. Metro-Goldwyn-Mayer, Inc*., --- U.S. ---,

---

the defendant was materially prejudiced by it. Defendants' motion for summary judgment relied almost exclusively on the six-year presumption, as defendants devoted merely four conclusory sentences of their twenty-eight page memorandum to the argument that plaintiff's delay was unreasonable.

134 S.Ct. 1962 (2014), which held that laches is not a defense to a copyright infringement action brought within the Copyright Act's limitations period, cast doubt on the doctrine's continuing viability in the patent context. Accordingly, the Federal Circuit convened en banc "to resolve whether...laches remains a defense to legal relief in a patent infringement suit." *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, ---F.3d---, 2015 WL 5474261, at *1 (Fed. Cir. Sept. 18, 2015) (en banc). It answered the question in the affirmative, leaving *Aukerman* intact in all respects relevant to plaintiff's motion.[3]

Under *Aukerman* and its progeny, a delay longer than six years from discovery of a patentee's infringement claim "raises a presumption that it is unreasonable, inexcusable, and prejudicial." *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998) (quoting *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (alterations in *Wanlass*). The patentee need not have actual knowledge of infringing activities to trigger the laches clock; constructive knowledge is enough. *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998). While there are "no bright line

---

[3] The Federal Circuit did "adjust the laches defense in one respect to harmonize it with *Petrella* and other Supreme Court precedent," 2016 WL 5474261, at *1, but the adjustment relates to injunctive relief, an issue neither party raises in conjunction with defendants' equitable defenses.

rules delineating the level of constructive knowledge of an act of infringement required to trigger the laches clock," *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,* No. CIV.A. 09-290, 2014 WL 183212, at *18 (W.D. Pa. Jan. 14, 2014) *aff'd,* No. 2014-1492, 2015 WL 4639309 (Fed. Cir. Aug. 4, 2015), constructive knowledge generally requires something more than a mere suspicion, but less than absolute assurance, of infringing activity. *Id.* Because patentees have a duty to "police their rights," ignorance of infringement will insulate them from laches only if their ignorance is justifiable. *Wanlass,* 148 F.3d at 1338. Where "the facts already known to [the patentee] were such as to put upon a man of ordinary intelligence the duty of inquiry," failure to "make such inquiry and investigation as the circumstances reasonably suggest" is "generally equivalent to actual knowledge." *Id.* (citations and internal quotation marks omitted). Accordingly, constructive knowledge may be imputed to a patentee who fails to investigate "pervasive, open, and notorious activities that a reasonable patentee would suspect were infringing," who is "negligently or willfully oblivious" to such activities, or who "fail[s] to examine readily available information" that would have put her on notice of her claim. *Id.* (citing cases).

Successful invocation of laches also requires an accused infringer to establish that the plaintiff's delay in bringing

suit resulted in material prejudice to the infringer, which "may be either economic or evidentiary." *Gasser Chair*, 60 F.3d at 774 (citation omitted). Economic prejudice may be established by showing that the defendant would "suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Id*. But litigation costs and damages "attributable to a finding of liability for infringement" do not qualify as economic prejudice; otherwise, economic prejudice would arise in every suit. *Aukerman*, 960 F.2d at 1033. Evidentiary prejudice, meanwhile, "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Id*.

Equitable estoppel is a distinct defense theory, which "requires a showing that the defendant relied on a misleading communication by the plaintiff that is inconsistent with his present claim." *SCA Hygiene Prods.*, 2015 WL 5474261 at *24 (citing *Aukerman*, 960 F.2d at 1041). While laches "focuses on the reasonableness of the plaintiff's delay in suit," equitable estoppel "focuses on what the defendant has been led to reasonably believe from the plaintiff's conduct." *Aukerman*, 960 F.2d at 1034. Accordingly, proof of equitable estoppel requires (1) statements or conduct by the patentee that supports an

inference that the patentee did not intend to press an infringement claim against the accused infringer; (2) reliance by the accused infringer on those statements or conduct; and (3) material prejudice to the accused infringer if the patentee is allowed to proceed. *Id*. at 1042.

Finally, waiver is the "intentional relinquishment or abandonment of a known right." *U.S. v. Woods*, 301 F.3d 556, 560 (7th Cir. 2002). It occurs when a party "expressly declines to assert a right," and is distinct from forfeiture, which may occur "by accident, neglect, or inadvertent failure to timely assert a right." *Id*. (citations omitted)

III.

A. <u>Laches</u>

Defendants argue that the presumption of laches applies here because plaintiff was on notice of its infringement claims as early as the spring of 2005 — more than six years before filing suit. While defendants identify, in bullet-point format, six categories of evidence that they claim establish that plaintiff knew Super X was selling the accused products to plaintiff's competitors and gave Super X permission to do so, only a small portion of this evidence is from the period to which the presumption would apply. Indeed, defendants admit that the "vast majority of Accused Product sales occurred after 2008, including 93.7% of the total accused units sold by Super X," and

that "[o]f those, 85.1% of the Accused Products sales took place in 2010 or later." Def.'s L.R. 56.1 Stmt., ¶ 72. Plaintiff obviously had no notice of these sales before the presumption cut-off date of October 10, 2006.

Defendants cite to three bodies of evidence from the pre-cut-off period:[4]

1) Statements that plaintiff's former CEO, Greg Traphagen, made to Super X in the spring and fall of 2005, which defendants characterize as "persuading Super X to drop its independent development [of products that would compete with the accused products] and work with Robertson to produce products that both could sell to their respective customers, including by using the Robertson patented technology" (Def.'s Opp. at 2);

2) Documents relating to the use of technology covered by the asserted patents in a joint redesign of certain Robertson

---

[4] I am mindful that the portions of defendants' memorandum that describe and quote from this evidence have been redacted, and that corresponding portions of the record have been filed under seal. I understand that defendants may consider the redacted material to be confidential, but they have not established that specific portion of the redacted or sealed material meets "the definition of trade secrets or other categories of bona fide long-term confidentiality" required to outweigh the public interest in the transparency of judicial decisions. *See Baxter Intern., Inc. v. Abbott Laboratories*, 297 F.3d 544, 545 (documents "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality."). Indeed, although significant material has been redacted by both parties throughout the course of these proceedings, evidently by agreement, I note that none of the parties' motions to seal "analyze the applicable legal criteria or contend that any document contains a protectable trade secret or otherwise legitimately may be kept from public inspection despite its importance to the resolution of the litigation." *Id*. at 546. Accordingly, as in my previous summary judgment decisions, I cite to sealed materials where needed to explain my resolution of the pending motion.

products. These include an email dated April 14, 2005, from Patrick Cheung, a Super X engineer, to Robert Pelino of Robertson, copying Robert Wisbey, Robertson's Vice-President of Technology, reporting on the status of Super X's work on the project, noting that the redesign could be completed in six weeks "[i]f we are allowed to use (copy?) RWW protection circuit" and that he was "not sure if this will infringe to (sic) RWW patent or not." (Lovsin Decl., Exh. 16). Defendants also point to a spreadsheet dated April 29, 2005, and titled "Super X/Robertson Technical Project List/Electronic," which contains the text "Can use RWW shutdown circuit" and "OK to use RWW EOL" in fields associated with two accused devices. (*Id.*, Exh. 21); and

3) Documents and testimony relating to the parties' collaboration, in September of 2006, to obtain "UL listings" for certain accused products. This evidence includes a letter signed by Andrew Bielski, Robertson's Manager of Product Services Engineering, authorizing Super X to copy portions of the Robertson UL file into Super X's file (*id.*, Exh. 31), and emails from Ron Bezdon, a consultant for Super X, to Mr. Bielski (copying Mr. Wisbey), which note, "[w]e sell this [i.e., two accused products previously identified by number] to other customers and they want the Multiple Listing" and "[w]e have shipped the units already with their labels on them" to "another Super customer." (*Id.*, Exh. 30);

I have reviewed the evidence in each of these categories closely and conclude that it did not put plaintiff on notice of Super X's infringing activity, nor did it trigger a duty for plaintiff to conduct further investigation at that time.

I addressed the first category — evidence that plaintiff "persuaded" Super X to drop its independent development efforts in favor of a joint project to redesign plaintiff's patented products which Super X could then sell royalty-free — in my decision denying defendants' motion for summary judgment. I explained that each of Mr. Traphagen's statements — indeed,

every communication of record between Robertson and Super X from the spring and fall of 2005 on the subject of the parties' collaboration in the joint redesign project — explicitly mentioned a royalty arrangement between the parties. *See* DN 332 at 8 (citing evidence). Indeed, Mr. Siu and Mr. Wisbey both confirmed at their depositions — and defendants do not dispute — that the parties' discussions at that time explicitly contemplated that Super X would "compensate" Robertson for the right to sell the joint design to other customers. B. Siu Dep., Hartsell Decl., Exh. 105, 111:3-5; Wisbey Decl., Lovsin Decl., Exh. 6 at 138:20-139:3; 196:11-14. I further observed that defendants' claim that the parties' relationship at that time was "more of a true partnership" than a supplier/customer relationship was not supported by the record. DN 332 at 7. My renewed examination of the defendants' evidence in this vein again persuades me that it raises no reasonable inference that plaintiff knew about, and acquiesced in, Super X's royalty-free sales of accused products to its other customers for resale within the United States.

The cornerstone of defendants' second body of evidence is Mr. Cheung's April 14, 2005, email to Mr. Pelino, in which Mr. Cheung reports on the status of the joint project and expresses uncertainty about whether Super X could "use (copy?) RWW protection circuit," together with a spreadsheet circulated

shortly thereafter by Mr. Wisbey, which includes the text, "OK to use RWW EOL." Defendants ask me to construe this evidence as proof of plaintiff's affirmative permission to Super X to sell the accused products to plaintiff's competitors, or at the very least, as proof that plaintiff was on notice of Super X's infringement. In context, however, the evidence reflects neither. As just noted, the parties' contemporaneous communications reveal that at the time of these exchanges, the parties were in discussions to allow Super X to sell the joint redesign to other customers in exchange for paying royalties to plaintiff. Even assuming that the text "OK to use RWW EOL" reflects plaintiff's agreement that Super X could incorporate plaintiff's patented technology into the redesign, the state of the parties' negotiations belies defendants' claim that that agreement amounted to permission for Super X to sell the accused products to plaintiff's competitors royalty-free. Nor would Mr. Cheung's comment, "not sure if this will infringe to (sic) RWW patent or not" have raised suspicions. Defendants point to no evidence that Mr. Cheung was involved in, or even aware of, discussions among the parties' corporate officers regarding a potential royalty arrangement; accordingly, his uncertainty about Super X's ability to include plaintiff's patented technology in the joint design was natural, but it would not have raised a red flag to Mr. Wisbey or Mr. Traphagen (who were

copied on Mr. Cheung's email to Mr. Pelino), both of whom *were* involved in those discussions. In short, even assuming that these Robertson officers surmised from Mr. Cheung's question that Super X intended to sell the redesigned product to others, nothing about that statement would have raised infringement concerns, since the parties were contemporaneously engaged in discussions that contemplated just such sales — in exchange for royalties.

Finally, defendants cite documents and testimony evidencing plaintiff's collaboration with Super X, in September of 2006, to obtain "UL listings" in Super X's name, the very purpose of which, defendants argue, was to enable Super X to sell the accused products to customers other than plaintiff. I addressed a portion of this evidence in my decision denying defendants' summary judgment motion and concluded that it established, at best, that "certain Robertson employees, including corporate officers, received information from which they might have concluded that Super X was selling the accused products to others in the U.S.," but fell short of showing that any Robertson employee had actual or constructive knowledge of defendants' infringement any time before 2008 or 2009. *See* DN 332 at 3, 5-6. Having reexamined this evidence closely, I now conclude that even drawing all reasonable inferences in favor of defendants, when the record is viewed as a whole, it does not

support a finding that plaintiff knew, any time prior to October 10, 2006, that Super X was infringing the asserted patents by selling the accused products, or offering the accused products for sale to, the Customer-Defendants.

Before proceeding to a review of the evidence, however, I pause briefly to set forth basic, undisputed facts about what the UL listing process is and how the parties invoked it. The parties agree that Underwriters Laboratories ("UL") is a third party safety certification organization, and that plaintiff had a "UL-certified testing laboratory," meaning that plaintiff "could conduct safety tests required to receive the UL certification referred to as 'UL listing.'" Pl.'s L.R. 56.1 Stmt., ¶ 46. From approximately June of 2005 to early 2007 (when UL opened a lab in China, closer to Super X's facilities), plaintiff conducted UL safety testing on approximately 40 Super X products pursuant to a contractual agreement between the parties. *Id*. at ¶ 47. Some of the products plaintiff tested for Super X are accused in this litigation. Def.'s L.R.56.1 (b)(3)(B) Stmt, ¶ 29. Plaintiff handled all of the UL listing projects it performed for Super X in the same manner, regardless of whether plaintiff had an interest in the product. Pl.'s L.R. 56.1 Stmt., ¶ 48. Specifically, in each case, plaintiff obtained a listing in both Robertson's and Super X's names. *Id*. at ¶ 49. According to Mr. Wisbey, the reason plaintiff obtained these

dual listings was that "the original engineering documentation package" came from Super X. Wisbey Dep., Hartsell Decl., Exh. 115, at 292:24-293:5.[5] Indeed, Mr. Wisbey testified that "where the basic documentation package came from Super X," Robertson could not have obtained a UL listing solely in its own name. *Id.* at 293:14-22. For the same reason, Mr. Wisbey explained, "even some products that we listed for Super X that Robertson had no interest in, we wound up with UL listing for them simply because of the way the process worked...." *Id.* at 293:8-12.

Defendants argue that plaintiff must have understood from its collaboration with Super X in the above described UL Listing process that Super X intended to sell the accused products to Super X's other customers. Defendants explain in this connection that a UL Listing "is linked to a particular company and a particular product. That is, only the company that is registered with UL for a particular product can apply a Listing Mark to that product." Def.'s L.R.56.1 (b)(3)(B) Stmt. ¶ 32. Defendants argue that because plaintiff already had a UL listing in its own name for the accused products — a fact plaintiff does not dispute — Super X would not have needed a listing in *its* name if all of Super X's sales of the accused products were to plaintiff, because in that case, plaintiff itself could apply

---

[5] While defendants object to Mr. Wisbey's testimony "to the extent it suggests that such dual listings were required," defendants do not identify any evidence suggesting otherwise.

the UL "Listing Mark" to the products. The only reason Super X needed UL Listings in its own name, it argues, is so that Super X could then "Multiple List" its other customers, who could then sell the products with UL Listing Marks under the customers' private labels. *See id*. at ¶¶ 30-32. In support of these facts, defendants rely largely on the declaration of Mr. Bezdon, the admissibility of which plaintiff contests.

Defendants also point to a September 2006 email from Mr. Bezdon to Mr. Bielski in connection with the UL Listing process in which Mr. Bezdon states, "[w]e sell this [i.e., "the EB-254 and EB-239HO ballasts" mentioned in the preceding sentence] to other customers and they want the Multiple listing." Lovsin Decl., Exh. 30. Later that same day, Mr. Bezdon emphasized in another email to Mr. Bielski, "I need to Multiple List another Super customer to our part number really badly. We have shipped the units already with their labels on them." *Id*. Mr. Wisbey was copied on both of these emails.

As noted, plaintiff responds first by objecting to the declaration of Mr. Bezdon on the basis that it "purports to offer expert testimony on UL operating procedures/protocols," yet there is no foundation establishing that Mr. Bezdon is competent to testify on this topic, nor was he disclosed as an expert under Rule 26. I agree that the statements by Mr. Bezdon on which defendants rely are in the nature of expert testimony.

Accordingly, he should indeed have been disclosed as a witness so that plaintiff could test his proffered opinions under Fed. R. Evid. 702. Even, however, if I consider his testimony on the UL Listing process, the inferential support it offers to defendants' claim that plaintiff knew or should have known about Super X's infringing activity no later than September of 2006 is negligible. In context, Mr. Bezdon's opinion about the UL Listing process is at best a "scintilla" of evidence that plaintiff knew, or should have known, about Super X's infringement. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("[t]he mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the [factfinder] could reasonably find for the [non-movant].")

First, even assuming that Mr. Bezdon is correct, as a general matter, that as a consequence of obtaining UL Listings in its own name, Super X was able to sell UL Listing Marked products to its other customers, nothing in his description of the UL Listing process suggests that plaintiff should have known or expected that Super X would exercise its ability to do so by selling plaintiff's patent-protected products to plaintiff's competitors in the United States. Indeed, as Mr. Wisbey explained at his deposition, because plaintiff applied for UL listings for numerous Super X products on Super X's behalf,

plaintiff "wound up with UL listing[s]" for some products that plaintiff had no interest in, "simply because of the way the process worked." Wisbey Dep., Hartsell Decl., Exh. 115, at 293:8-11. Accordingly, even assuming that plaintiff knew that obtaining UL listings in Super X's name would enable Super X to sell accused products to others, that knowledge does not raise an inference that plaintiff knew or suspected that Super X would do so, especially since plaintiff believed the parties' 2001 Manufacturing and Development Agreement prevented Super X from doing so.[6] Mr. Wisbey also testified that plaintiff had used UL Listings to facilitate product approvals in Europe, *see* Hartsell Decl., Exh. 115 at 299:5-13, so even if plaintiff understood that Super X intended to use UL listings in its name to sell the accused products to other customers, it could have done so

---

[6] I refer here to the August 14, 2001, Manufacturing and Development Agreement between the parties, which provides that all intellectual property resulting or arising out of any collaborative "Development Project" was owned by Robertson. *See* Pl.'s SJ Mot., Exh. 15 at ¶ 4.0. As I noted in my September 18, 2015, decision denying defendants' motions to exclude certain expert testimony and for partial summary judgment of no lost profits, there is an "embedded dispute" in this action as to whether this agreement was enforceable beyond its initial expiration date of August 2004, but the parties' submissions thus far have not presented that issue for resolution. For present purposes, the enforceability of the contract is immaterial. What matters is whether plaintiff believed the contract was in force and that it protected its intellectual property rights vis-à-vis Super X. Defendant has identified no evidence to the contrary, and, indeed, that is the position plaintiff has taken consistently in both this and co-pending litigation. *See* Case No. 13 C 9185 (N.D. Ill.)

without infringing plaintiff's patents, further attenuating the inference that plaintiff must have known from the UL listing process that Super X was in fact infringing.

Defendants overstate the significance of Mr. Bezdon's statement, "we sell this to other customers," in his September 13, 2006, email to Mr. Bielski. Mr. Bezdon's email identified the products at issue by number, and nothing in the text of his email drew attention to the fact that those particular products— among the forty plaintiff tested and submitted for UL Listing on Super X's behalf, following the same protocol in each instance— contained plaintiff's patented technology, nor did the email disclose the identify or location of the "other customers." Indeed, Mr. Bezdon testified that Super X generally kept that information under wraps. Bezdon Decl., DN 185-2 at ¶ 22 (Super X "generally tried to keep the specifics of our relationships with our customers – including what products they were ordering from us – confidential"). And Mr. Siu confirmed that Super X never told plaintiff that it was selling the accused products to plaintiff's competitors. Siu Dep., Hartsell Decl., Exh. 105 at 287:6-13 ("Q: Did Super X ever specifically tell Robertson that it was selling patented products for resale in the United States to any of the defendants in this lawsuit? A: No.  Why would I have to tell Robertson who we sell to?  They are only a

customer. They are a very long-term relationship customer, but they are only a customer.").

Finally, Mr. Bezdon's September 13, 2006, emails were directed to Mr. Bielski, who defendants do not assert had any responsibility for policing plaintiff's intellectual property rights, even assuming that he gleaned from the product numbers that those rights were potentially at stake. To be sure, Mr. Wisbey was copied on the email; but the email did not request any action or solicit any response on his part. The same is true about the email Mr. Bezdon sent later that day, explaining that Super X had "shipped the units already" to another customer.

Moreover, the record as a whole counsels against the conclusion that Super X's infringement was "open and notorious." In addition to confirming that he never affirmatively told plaintiff who Super X sold accused products to, Mr. Siu testified that while the labels Super X affixed to ballasts it sold to plaintiff were marked with the Asserted Patent numbers, the labels it affixed to the accused products sold to the Customer-Defendants were not. *See* B. Siu Dep., Hartsell Decl., Exh. 105 at 87:13-88:11; 82:22-83:8; 139:12-17; 315:21-24. In fact, the labels Super X affixed to the accused products it supplied to GE said "Designed By GE," even though Mr. Siu knew that was not true. *Id*. at 315:25-317:2. This evidence cuts

strongly against a finding that Super X's sales of the accused products to plaintiff's competitors was "open and notorious."

In sum, even taken together, the evidence relating to the period prior to October 10, 2006, does not establish that plaintiff had actual knowledge of any defendant's infringing activity, nor does it reflect the kind of "pervasive, open, and notorious activities" that would lead a reasonable patentee to suspect infringement and thus trigger a duty to investigate. Accordingly, I conclude that defendants are not entitled to a presumption of laches. What remains is whether even absent the presumption, defendants' evidence reasonably suggests that plaintiff unduly delayed filing suit; that it did so without justification; and that defendants were prejudiced. *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992). In this connection, defendants cite the following bodies of evidence:

1) Documents and testimony relating to the parties' further collaboration to obtain UL listings for additional accused products between November 2006 and March 2007. This evidence includes an email chain among Messers. Bezdon, Bielski and others that contains an embedded email from defendant Halco requesting that Super X provide multiple [UL] listings for fifteen products, including two accused products. (*Id.*, Exh. 29) In roughly contemporaneous emails, Mr. Bezdon explains to Mr. Bielski (copying Mr. Wisbey), that obtaining multiple UL listing was urgent, noting that "we are both now shipping" [certain accused products], and that Super X needed UL listing information for "a customer we have shipped to." (*Id.*, Exhs. 37-38).

2) Communications among corporate officers of Robertson and Super X in February of 2008 relating to modifications of certain accused products. In these communications, Robertson's corporate officers stated, "[w]e would like this new design to be a RWW product (a higher performance unit) and not a general sale unit available to anyone," and "[w]e will probably want this ultimate solution to have some level of exclusivity for Robertson." *Id.*, Exh. 44. Subsequent communications reflect the contributions Robertson and Super X each believed they had made to the joint project, and include statements by James McCarthy, Robertson's COO, that Super X's "design effort began with our then available Robertson design, including the patented EOL circuit." McCarthy was "concerned," based on recent sales Robertson had lost to defendant Keystone, "if our competition gains the benefit of our effort and does not have to pay for this benefit." *Id.*, Exh. 46.

3) Communications in October of 2008 among Messrs. McCarthy, Bezdon, Siu, Cheung, and others about problems with T5HO" ballasts, which include accused products. These communications reflect Mr. McCarthy's understanding that defendant Keystone and "other Super X customers" had purchased T5HO ballasts from Super X. *Id.*, Exh. 48.

The first category of evidence again relates to UL Listings, and again it does not establish plaintiff's actual or constructive knowledge of Super X's infringing activity. While it possible to ascertain, from a multi-page email chain spanning January and February of 2007 among Messrs. Bezdon, Bielski, and others, that defendant Halco was the customer Super X was seeking to Multiple List, these emails again fail to raise the inference that anyone charged with policing plaintiff's intellectual property rights should have been alerted to possible infringement. *See* Lovsin Decl., Exh. 29. While these emails are more informative than those discussed in the previous

section with respect to the "other customer," they are less so with respect to the patented nature of the products at issue. Indeed, Mr. Bezdon does not identify any product specifically in his email to Mr. Bielski, and scrolling down the email chain reveals a list of fifteen products — all identified by number — for which Halco was awaiting a multiple listing, only two of which are among the accused products. For these reasons, and those discussed in the previous section, these additional missives from Super X on the subject of UL Listing did not put plaintiff on notice of potential infringement.

The last two bodies of evidence offer a somewhat more compelling basis for inferring that plaintiff knew or should have known that Super X had made infringing sales as of February of 2008. Indeed, it is possible to infer from a series of emails among Messrs. McCarthy, Wisbey, and Siu in February 2008 that the parties did not see eye to eye on whether Super X could sell accused products to third parties (such as defendant Keystone) that competed with plaintiff in the marketplace. *See*, e.g., Lovsin Decl., Exhs. 46-47. I agree with defendants that in the context of those emails, a reasonable interpretation of Mr. Siu's statement that a "new board design...will be 100% Robertson's property and we will not sell this design to any other customer" is that Super X believed it could sell — and was, indeed selling — ballasts incorporating the parties' joint

design to plaintiff's competitors. Nevertheless, even assuming that plaintiff became aware of Super X's infringing sales to Keystone at that time, I am not persuaded that plaintiff unreasonably delayed filing suit after that time.

As defendants acknowledge, the parties had a long-standing relationship, which the evidence suggests plaintiff hoped to preserve through negotiation, and which presumably would have been seriously threatened by litigation. Moreover, that approach was reasonable, given the limited scope of defendants' infringement at that time: recall defendants' admission that 93.7% of the total accused units sold by Super X were sold *after* 2008, and that over 80% were sold in 2010 or later. Def.'s L.R. 56.1 Stmt., ¶ 72. Indeed, plaintiff's assertion that it did not "appreciate the widespread nature of [defendants'] infringement" until it began purchasing and reverse engineering their products beginning in 2009 is uncontroverted. None of defendants' authorities persuades me, in view of these factors, that plaintiff unreasonably delayed filing suit until October of 2012. Accordingly, I need not reach the issue of prejudice.

## B. Equitable Estoppel and Waiver

I thus turn to the issues of equitable estoppel and waiver, to which the parties devote significantly less attention. Defendants argue that plaintiff "explicitly and implicitly gave permission to Super X to sell the accused products to other

customers," which led Super X reasonably to believe that it did not intend to enforce the asserted patents. But as discussed above and in my previous decision, the evidence defendants cite cannot reasonably be construed as permission to sell the accused products to plaintiff's competitors. Moreover, permission cannot be inferred from plaintiff's silence unless plaintiff was aware that Super X was likely infringing its patents. *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (equitable estoppel requires that the party to be estopped "usually must have knowledge of the true facts"). As discussed above, defendants' evidence generally fails on this front, too.

Defendants cite five cases in their equitable estoppel argument, none of which persuades me that the doctrine is appropriately invoked on this record. The first is *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062 (Fed. Cir. 1995). In that case, the patentee and the defendant corresponded and met over a two year period in which they disputed whether the defendant infringed the asserted patent. At the end of that period, the defendant continued to deny infringement, and the patentee took no further action because its management "decided not to sue" the defendant. *Id.* at 1063. The patentee later granted the plaintiff an exclusive license to the asserted patent, and three years after that, the licensee sued the

defendant for infringement. The Federal Circuit upheld the district court's conclusion that the suit was barred by equitable estoppel. The court concluded that the patentee's "long period of inaction after [the defendant] had denied infringement," together with additional factors, including that the patentee and the defendant had continued to negotiate and to execute licensing agreements under other patents held by the patentee, led the defendant reasonably to conclude that the asserted patent would not be enforced. These facts are plainly distinct from the present scenario, most significantly in that plaintiff never indicated to defendants, prior to initiating this lawsuit, that it believed they were infringing the asserted patents such that its subsequent silence could reasonably be construed as acquiescence to the infringing conduct.

Nor is this case similar to *Aspex Eyewear Inc. v. Clariti Eyewear Inc.*, 605 F.3d 1305 (Fed. Cir. 2013). There, the parties had a history of litigating several of the plaintiff's patents. With respect to the patents asserted in the case, the plaintiff sent the accused infringer a letter stating "[i]t has been our policy and continues to be our strong intention to fully and vigorously enforce our [patent] rights," and requested an immediate response. *Id*. at 1308. The accused infringer responded, and the parties exchanged further correspondence. In the last of these, the accused infringer reiterated its position

that it did not infringe the asserted patents. The plaintiff was silent for the next three years, but then reemerged with renewed allegations of infringement and proceeded to file suit. On these facts, the Federal Circuit concluded that the trial court had not abused its discretion in determining that the plaintiff's suit was equitably estopped.

The remaining cases defendant cites are distinct for similar reasons. *See Radio Sys. Corp. v. Lalor*, 709 F.3d 1124 (Fed. Cir. 2013) (patentee sent demand letter to accused infringer stating that it "must take a license or cease all manufacturing and destroy all sales inventory"; accused responded claiming the asserted patent was invalid; no further action by patentee for over four years), *Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 119-20 (D. Mass. 1993) (noting that "[c]ourts have generally held that in order for a patentee's silence to be considered misleading the patentee must first threaten prompt and vigorous enforcement of the patent," which the patentee had done with multiple cease and desist letters) (internal quotation marks, alterations, and citations omitted), *aff'd* 26 F.3d 140 (Fed. Cir. 1994) (Table); *In re Yarn Processing Patent Valitidy Litigation (No. II)*, 602 F. Supp. 159, 172 (W.D.N.C.) (estoppel appropriate where patentee sued two defendants for infringement, then was silent for years after the suits were dismissed before reasserting infringement in a

subsequent suit, and threatened suit against a third defendant but did not initiate action until thirteen years later). None of these cases bears any meaningful resemblances to this case. As the court noted in *Aspex Eyewear*, whether a patentee's silence and inaction is misleading must be evaluated "in the context of the specific interaction between the parties." 605 F.3d at 1310. For reasons explained throughout this decision, I conclude that plaintiff's silence cannot reasonably be construed as misleading Super X into believing it had permission to sell the accused products to the Customer-Defendants. Equitable estoppel is thus inappropriate.

Defendants' waiver argument requires no additional discussion, as it merely reiterates their position that plaintiff granted Super X permission to sell the accused products to "other customers" and asserts that this permission constituted plaintiff's intentional relinquishment or abandonment of its right to enforce the asserted patents. Because the evidence does not reasonably support the conclusion that plaintiff granted Super X such permission, this argument fails.

IV.

Almost as an afterthought, plaintiff's motion also seeks summary judgment of infringement of claims 5 and 10 of the '032 Patent and claims 1, 10, and 14 of the '838 Patent, observing

that defendants do not dispute the opinion of plaintiff's expert that these claims are infringed. This straightforward argument has merit. Indeed, defendants do not argue that these claims are not infringed, but they oppose summary judgment on the ground that the asserted claims are invalid. While it is true that defendants cannot be liable for infringement of an invalid claim, the Federal Circuit "has long recognized that patent infringement and invalidity are separate and distinct issues." *Pandrol USA, LP v. Airboss Ry. Prods., Inc.,* 320 F.3d 1354, 1365 (Fed. Cir. 2003) (citing cases). Indeed, in *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983), the court observed that the trial court's determination of noninfringement "apparently flowed from the conclusion on invalidity." The Federal Circuit agreed that the patents at issue were invalid, but noted that the "better practice" would have been to resolve the issue of infringement as well. Id. Indeed, the Supreme Court reaffirmed earlier this year that infringement and validity "are separate issues under the Act," and held that "[w]hen infringement is the issue, the validity of the patent is not the question to be confronted." *Commil USA, LLC v. Cisco Systems, Inc*. 135 S. Ct. 1920, 1928 (2015). Accordingly, although I have previously determined that defendants are entitled to summary judgment of invalidity as to claims 5 and 10 of the '032 Patent, see Order of Sept. 18, 2015

(DN 328), I nevertheless grant plaintiff's motion for summary judgment of infringement.

IV.

For the foregoing reasons, plaintiff's motion for summary judgment is granted.

ENTER ORDER:

_____
Elaine E. Bucklo
United States District Judge

Dated: May 24, 2016