IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Robertson Transformer Co. d/b/a/ Robertson Worldwide, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 12 C 8094 |
| General Electric Company, et al. | ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION AND ORDER

Before me are the parties' motions *in limine*, which I
resolve as set forth below.

## A. Plaintiff's motions

1. *Motion to exclude argument, documents, and testimony
concerning equitable defenses the court rejected as a matter of
law*. This motion is denied in part as moot and is otherwise
denied. All agree that it would be improper to introduce
argument or evidence directed solely to issues resolved on
summary judgment. It is plain, however, that much of the
evidence defendants cited in support of their equitable defenses
is also relevant to other issues that must be tried to a jury,
including willfulness. *See WBIP, LLC v. Kohler Co.*, ---F.3d---,
2016 WL 3902668, at *15 (Fed. Cir. Jul. 19, 2016) ("[w]e do not
interpret *Halo* as changing the established law that the factual

components of the willfulness question should be resolved by the jury.... Willfulness of behavior is a classical jury question of intent. When trial is had to a jury, the issue should be decided by the jury.").[1] Although I determined at summary judgment that defendants' evidence was legally insufficient to establish their equitable defenses of laches, equitable estoppel, and waiver, my previous decisions did not resolve the question of defendants' subjective intent. Elsewhere in this decision I address the evidence that the parties may present on that issue.

2. *Motion to exclude arguments, documents, and testimony concerning any implied license defense*. This motion is granted. Although I agree that this motion essentially seeks summary judgment motion in plaintiff's favor on defendant's sixth affirmative defense of "license and exhaustion," and would

---

[1] In a footnote to this portion of text, the court explained that in *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923 (2016), the Supreme Court declined to resolve whether there is a Seventh Amendment right to a jury trial on the issue of willfulness, concluding: "This leaves in place our prior precedent that there is a right to a jury trial on the willfulness question. Our case law is clear that in the absence of the Court overturning our established precedent that precedent remains in effect. *See, e.g., Masias v. Sec'y of Health & Human Servs.*, 634 F.3d 1283, 1288 (Fed. Cir. 2011) (citing *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006)). Of course, this is not to say that a jury verdict of willful infringement ought to result in enhanced damages. Whether the conduct is sufficiently egregious as to warrant enhancement and the amount of the enhancement that is appropriate are committed to the sound discretion of the district court."

better have been presented under Rule 56, I agree with plaintiff that my grant of summary judgment in its favor on defendants' equitable defenses eviscerates their "license and exhaustion" affirmative defense. Defendants insist that equitable estoppel and the implied license defense are not coterminous, and that the latter does not require a formal finding of the former, citing *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F. 3d 1571 (Fed. Cir. 1997), and *Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363 (Fed. Cir. 2001). Specifically, defendants focus on the doctrine of "implied license by legal estoppel," which, in their view, requires the consideration of elements I have not previously addressed. I disagree.

In *Wang*, the Federal Circuit explained: "The primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use, or sell: i.e., a license." *Wang*, 103 F.3d at 1582. While the court acknowledged that "no formal granting of a license is necessary," id. at 1580, the doctrine explicitly requires an "affirmative grant of consent or commission." At summary judgment, I concluded that defendants' evidence "cannot reasonably be construed as permission to sell the accused products to plaintiff's competitors," since it did

not establish that any of plaintiff's employees with responsibility for enforcing plaintiff's patent rights was aware that defendants were likely infringing the asserted patents. See DN 332, 378. While there may indeed be circumstances, as the Federal Circuit acknowledged in *Wang* and *Winbond*, in which an implied license defense would succeed where an equitable estoppel defense fails, defendant does not explain how that can be the case where the patentee was not aware of the infringing activity.

Defendants acknowledge that my summary judgment decisions on their affirmative defenses were based largely on the conclusion that plaintiff was unaware of defendants' infringement. Nevertheless, defendants insist that plaintiff's lack of awareness "is not determinative of Defendants' Sixth Affirmative Defense." But this argument merely reverts back to the observation that no "formal" license is necessary, and the cases they cite—*Wang*, *Winbond*, and *De Forest Radio Telephone & Telegraph Co. v. U.S.*, 273 U.S. 236 (1927), do not support the proposition that a patentee can be deemed by its actions to have affirmatively granted a license without knowledge of the putative licensee's likely infringement. Indeed, defendants acknowledge that a patentee's language or conduct must be of the kind "from which [the infringer] may properly infer that the owner consents to his use of the patent." *De Forest*, 273 at

241. Defendants do not explain, nor does the evidence they cite suggest, why any inference that plaintiff consented to the infringement was proper.

For these reasons, plaintiff's motion *in limine* is granted to the extent it seeks to prevent defendants from introducing documents and testimony for the purpose of arguing that they are not liable for infringement on the ground that Super X had an implied license covering the accused devices, or that exhaustion principles bar enforcement of the patent against the Customer Defendants. I note, however, that plaintiff's motion does not identify specifically the evidence and testimony it seeks to bar, while defendants argue that "virtually all of the documents and testimony related to this defense will overlap with other issues before the jury, including secondary consideration, damages, and willfulness." This motion *in limine* is granted without prejudice to defendants' ability to present appropriate evidence on those issues.

3. *Motion to exclude invalidity arguments, documents, and testimony going beyond what is disclosed in defendants' expert report*. This motion is granted in part, denied in part as moot, and otherwise denied. The portion of the motion directed to Mr. Hesterman's proposed testimony is denied as moot in light of defendants' representation that they "do not intend for Mr.

Hesterman to offer testimony on invalidity beyond the scope of his invalidity expert report in its case in chief." To the extent this representation does not entirely moot plaintiff's motion as it relates to Mr. Hesterman's proposed testimony, the motion is denied because it does not indicate the specific opinions or testimony it seeks to preclude, and because plaintiff's speculation that defendants might seek to use "passing references" to prior art "as a hook to elicit testimony" regarding the state of the art does not support the broad order it seeks. Counsel is advised, however, that strict compliance with Fed. R. Civ. P. 26(a)(2)(B) is expected, and that I will sustain objections to expert testimony on the ground that it exceeds the scope of the expert's report unless counsel can identify the specific portion or portions of the report that articulate the "basis and reasons for" the opinions elicited.

Plaintiff's motion is granted as it pertains to Mr. Bezdon's proposed testimony about the '180 Patent, which is identified as prior art to the asserted patents. There is no dispute that because Mr. Bezdon was not disclosed as an expert, he may testify only as a fact witness. I agree with plaintiff that any fact testimony Mr. Bezdon might offer with respect to

the '180 patent is either irrelevant to the validity inquiry or falls within the realm of expert testimony.[2]

4. *Motion to exclude evidence from collateral litigation.* This motion is granted in part. Plaintiff argues that defendants should be barred from tendering evidence produced or obtained during discovery in the parties' related contract dispute because those materials—which were produced in this case in a "supplemental production" after discovery had closed—are irrelevant, tardy, or both. Although I generally agree that defendants should be precluded from presenting evidence developed only after the close of discovery in this case, the universe of evidence plaintiff seeks to bar includes documents that were "previously produced by Super X, Robertson or third parties (Ronald Bezdon or UL) *in this case*." Mot. at 2 (quoting from transmittal letter accompanying defendants' supplemental

---

[2] Although unrelated to Mr. Bezdon's proposed testimony about the '180 Patent, a question arose at the pre-trial conference held on August 18, 2016, as to whether Mr. Bezdon may testify about the UL listing process. In a previous decision, I concluded that statements Mr. Bezdon made in a declaration that generally described the UL listing process and its purpose were in the nature of undisclosed expert testimony. While my view that Mr. Bezdon may not offer expert testimony about the UL listing process has not changed, he may, of course, testify about his communications with the parties on the topic of Robertson's role in multiple listing certain of the accused products, and his testimony may include the basis for his belief that those communications show that Super X had permission to sell those products to its other customers, provided his testimony is limited to in his first-hand experience.

production, emphasis added). Documents falling into that category will not be subject to exclusion, and witnesses who will testify at trial may be asked about them. In addition, evidence developed in the contract case, such as Mr. Wisbey's January 2016 deposition testimony, may be used to impeach a witness's trial testimony.

With respect to documents that were produced only after discovery in this case had closed, and that are not offered solely for impeachment, plaintiff's motion is granted, except to the extent defendants can establish, that any specific document they wish to use at trial was subject to production in this case. Defendants' submission in this regard must be made in writing at least forty-eight hours in advance of defendants' proposed use of the evidence, and plaintiff will be entitled to respond, in writing, within twenty-four hours thereafter. Any relevance objections plaintiff has to specific evidence their motion encompasses should likewise be raised in its submission.

5. *Motion to preclude defendants' damages expert Bruce Abramson from testifying at trial.* This motion is granted. To begin, there is no merit to defendants' argument that plaintiff has waived its objection to Dr. Abramson's testimony.[3] Under Fed. R.

---

[3] Defendants' waiver argument invokes my pretrial order instructions, which state that objections to witnesses not

Evid. 702, I may allow a witness to testify as an expert only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles or methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." This rule, along with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), require me to determine "whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Higgins v. Koch Development Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) (citation omitted). I have closely reviewed Dr. Abramson's qualifications, his expert report, and the cases cited by both sides, and I conclude, for the reasons explained below, that Dr. Abramson's proposed testimony falls short on several of these fronts.

As to Dr. Abramson's qualifications, there is merit to plaintiff's argument that Dr. Abramson "does not do what he is

---

raised in the final pretrial order "will be deemed waived absent showing of good cause." But here, plaintiff raised its objection to Dr. Abramson's testimony in a Daubert motion filed concurrently with its summary judgment filings. My denial of that motion stated explicitly that it was "without prejudice to plaintiff's ability to reassert its grounds for excluding Dr. Abramson's opinions and testimony in an appropriate pre-trial motion." DN 340. That is what plaintiff has done.

qualified to do and is not qualified to do what he does." It is plain from Dr. Abramson's report that he purports to offer an "economic analysis" both to rebut the opinions of plaintiff's damages expert, Mr. Carter, and to support his own alternative damages calculations. *See*, e.g., Abramson Rep., DN 530 at ¶ 6 (opining that Mr. Carter "has provided no reasonable economic basis for a lost profits claim") and ¶ 33 (stating that his own damages calculations are "better grounded in...accepted economic theory.").

Indeed, Dr. Abramson explicitly claims to provide an "economic analysis" in support of his opinions, which purport to apply concepts drawn from the "economic subfield" of "industrial organization, and specifically antitrust economics." *Id*. at ¶ 36. Yet Dr. Abramson's graduate studies did not include coursework in economics or any of its subfields, *see* Abramson Dep., DN 434-1 at 38:9-39:4, nor does Dr. Abramson hold a degree in economics or accounting—two fields from which damages experts commonly emerge. While defendants are correct that a damages expert is not *required* to be an economist or an accountant, *see, e.g., Carnegie Mellon University v. Marvell Technology Group, Ltd.,* 807 F.3d 1283, 1303 (Fed. Cir. 2015), experts must have specialized "knowledge, skill, experience, training, or education" in the field whose principles and methodology they

invoke to support their opinions.  Fed. R. Evid. 702.  Here, Dr. Abramson's report makes clear that that field is economics.

At best, the record establishes that Dr. Abramson has expertise in the fields of Bayesian statistics (which, he explained, "deals specifically with the introduction and incorporation of subjective probability assessments integrated with – in settings in which data is unavailable," Abramson Dep., DN 434-1 at 90:7-10), and economic modeling.  But Dr. Abramson denied conducting "any kind of Bayesian analysis" to arrive at his opinions in this case, *id.* at 90:24-91:2, and nothing in his report suggests that he performed any economic modeling.

In apparent acknowledgement that Dr. Abramson is not qualified to testify as an expert economist, defendants insist that he is not "being offered up as 'an economist,'" but rather as "a damages expert and economic modeler."  Def.'s Opp. at 1. As just noted, however, defendants do not point to any portion of Dr. Abramson's report in which he performs economic modeling, and none of the authorities they cite suggests that "damages expert" is a recognized field of expertise.  *See* Def.'s Opp. at 4 (citing *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (certified public accountant a qualified damages expert); *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) (metallurgical engineer and mechanical engineer qualified experts in field of "automotive design or

manufacture.")). Defendants' citation to *Veracode, Inc. v.*
*Appthority, Inc.*, 137 F. Supp. 3d 17 (D. Mass. 2015), a case
involving a software patent in which Dr. Abramson—who holds a
Ph.D. in computer science—testified as a damages expert does
not, standing alone, persuade me that he is qualified to offer
the opinions he expresses here.

Further, even if I were persuaded of Dr. Abramson's
qualification to offer an economic analysis of plaintiff's
damages, it is well established that even a "supremely qualified
expert cannot waltz into the courtroom and render opinions
unless those opinions are based upon some recognized scientific
method and are reliable and relevant" under *Daubert*. *Clark v.*
*Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir.1999). Based on
my review of Dr. Abramson's report, I conclude that significant
portions of it are based upon a flawed methodology. In
particular, plaintiff's complaint that Dr. Abramson relied
excessively on short, informal interviews with Super X's
witnesses—while declining to examine meaningfully the evidence
of record—has merit, and the result of his flawed methodology is
apparent in the numerous statements in his report that read less
like an expert opinion and more like a regurgitation of
defendants' theory of the case. For example, in ¶ 23 of his
report, which falls under the heading "Litigation History," Dr.
Abramson parrots defendants' view that Super X's 2006 sales of

accused products to plaintiff's competitors "demonstrated its belief that its collaboration on the product redesign had earned it the right to make those sales—and given that Robertson was aware of these sales from an early date, Super X had no reason to doubt this belief." Unsurprisingly, Dr. Abramson cites "Conversation with Billy Siu" as the source of this "opinion."

Other examples in which Dr. Abramson offers uncritical repetition of defendants' case narrative in the guise of an expert opinion abound. At ¶ 18 of his report, Dr. Abramson again parrots defendants' theory that "Mr. Wisbey, as noted Robertson's Vice-President of Technology at the time, also tried to persuade Super X to drop its independent efforts in favor of joint designs that they could sell to their respective customers, emphasizing that Robertson and Super X 'have more of a true partnership and less of arm's length supplier/customer relationship.'" As I have previously observed, this selective excerpt of an email, which defendants also cited at summary judgment, omits essential elements of the text and "spin[s] the facts in a way the record does not support." DN 332 at 7. Dr. Abramson's unexamined repetition of the partial quotation in his opinion highlights his failure to review the record in any sort of objective fashion.

Even if I were to disregard the paragraphs discussed above as directed to background information that is not essential to

Dr. Abramson's substantive opinions, his excessive reliance on defendants' witnesses is not confined to the section of his report captioned "Litigation History." His opinions under the heading "Industry Structure," for example, likewise cite overwhelmingly to "Conversations" with Greg Traphagen, a former Robertson executive and witness for defendants, and/or Steve Stevens, another of defendants' experts. At his deposition, Dr. Abramson testified that the cited conversations with these and other defense witnesses lasted somewhere in the neighborhood of a half hour to an hour; that he did not use a written list of questions but instead had a "mental list" of issues he hoped to discuss; that he took minimal or no notes of his conversations and threw away any notes that he may have taken; and that he did not know whether his interviewees had been deposed in the case, and if so, he had not reviewed their testimony. *See* Abramson Dep., DN 434-1 at 106-112, 115-117, 136, 140, 138-139.

While it is not categorically inappropriate for experts to rely on witness interviews, and experts "routinely rely upon other experts hired by the party they represent for expertise outside of their field," *Apple Inc. v. Motorola*, 757 F.3d 1286, 1321 (Fed. Cir. 2014), *overruled on other grounds,* Dr. Abramson's unilluminating citations to "conversations" with these witnesses, as opposed to their sworn testimony or statements in the record, or, in Mr. Carter's case, to his

expert opinions and analysis, bear none of the hallmarks of reliable scientific methods such as logical induction, inferential statistics, or Bayesian inference, which Dr. Abramson himself has acknowledged in his own scholarly work are necessary to establish reliability under *Daubert*. *See Blue Smoke or Science? The Challenge of Assessing Expertise Offered as Advocacy*, 22 Whittier L. Rev. 723 (2001). For example, although Dr. Abramson's critique of Mr. Carter's lost profits analysis purports to dispute what the "data" show, his own assessment of the data is utterly conclusory and lacks the kind of "formal inference chain" he has argued outside the context of this litigation is required for data analysis to be scientifically reliable. *Id*. Indeed, nearly every reference in Dr. Abramson's report to "data" is supported by a generic citation to a long list of exhibits to Mr. Carter's expert report, *see*, e.g., Abramson Rep., DN 530 at ¶ 44, or, in some instances, by no citation at all. *See id*. at ¶ 41. Moreover, Dr. Abramson's heavy reliance on "conversations" makes it nearly impossible for plaintiff to test the factual underpinnings of his opinions through cross-examination.

For at least the foregoing reasons, I conclude that defendants have not established—as indeed it is their burden to do, *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)—the admissibility of Dr. Abramson's testimony.

6. *Motion to exclude arguments and evidence concerning purported available, acceptable, non-infringing substitutes.* This motion is denied as moot to the extent it is directed to Dr. Abramson's testimony and is otherwise denied. As plaintiff explains, a patentee seeking lost profits as a measure of damages in the event it proves patent infringement bears the initial burden of establishing a "reasonable probability" that absent the infringement, the patentee would have made the infringing sales. Pl.'s Mot. at 2. Plaintiff states that it intends to invoke the so-called *Panduit* factors to carry its initial burden, which requires it to establish: 1) demand for the patented product; 2) absence of acceptable non-infringing substitutes; and 3) manufacturing and marketing capacity to exploit additional demand. *Id.*, *citing* 7-20 Chisum on Patents § 20.05 (2012); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978). The thrust of plaintiff's motion is that all of defendant's evidence directed to the second factor—the existence of acceptable non-infringing substitutes—should be excluded because it is legally insufficient.

I previously denied a partial summary judgment motion, as well as two *Daubert* motions, that defendants brought on issues bearing on plaintiff's claim for lost profits. In connection with the partial summary judgment motion—in which defendants

asserted a mirror image of the argument plaintiff raises in its motion *in limine*, i.e., that *plaintiff* had no legally sufficient evidence to establish, prima facie, *Panduit* factor two—I noted that the argument "spawn[ed] a multitude of highly fact intensive sub-arguments," counseling against summary judgment.

Indeed, the Federal Circuit has held, applying Seventh Circuit law, that a motion *in limine* is "not the appropriate vehicle for weighing the sufficiency of the evidence." *Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1378 (Fed. Cir. 2012) (reversing grant of patentee's motions *in limine*, citing *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1362 (7th Cir. 1996)). If plaintiff's motion, which attacks, using broad brush strokes, entire categories of evidence that defendants claim will prove the availability of acceptable non-infringing substitutes, were granted, it would effectively strip defendants of their ability to rebut plaintiff's claim for lost profits. *See Meyer*, 690 F.3d 1371. Plaintiff's motion *in limine* is not the appropriate vehicle for resolving this issue, which, as my previous decisions in this case reflect, requires a highly nuanced and fact-intensive analysis. At all events, even plaintiff tacitly acknowledges that some of the evidence it claims is "irrelevant" to lost profits—putative alternatives that were not actually on the market during the infringement period—may *sometimes* be

considered. Pl.'s Mot. at 5 (noting that under Federal Circuit law, "off-market alternatives should *rarely* be considered by the fact-finder.") (emphasis added).

7. *Motion to exclude certain damages-related arguments and evidence.* This motion is denied as moot. Plaintiff first seeks to bar argument or evidence intended to establish a lack of demand for the patented products, i.e., the first *Panduit* factor. Defendants acknowledge, however, that demand for the patented products existed during the relevant period, and they disavow any intent to argue otherwise. Resp. at 3, n. 3. The remainder of plaintiff's motion is moot because it challenges various aspects of Dr. Abramson's opinion, and I have already determined that Dr. Abramson will not be permitted to testify.

## B. Defendants' motions

1. *To exclude evidence regarding the redesign of Super X's products to prove infringement in violation of F.R.E. 407.* This motion is denied. As is evident from defendants' framing of the motion, they do not actually seek to exclude *evidence* of Super X's redesign, but rather seek to preclude the *argument* that this evidence tends to show that the accused products infringe. Indeed, both sides acknowledge the admissibility of evidence of Super X's redesign for other purposes, including on the damages-

18

related issue of the availability of non-infringing alternatives.

Because plaintiff represents that it will not use the redesign evidence for the purpose of proving infringement, whether doing so would violate Rule 407 is an academic question I need not resolve. Defendants are free to object, at trial, to any particular use of the evidence they believe is inappropriate. *See Hawthorne Partners v. AT&T Technologies*, 831 F. Supp. 1398, 1400-01 (N.D. Ill. 1993) (unless evidence inadmissible on all potential grounds, evidentiary rulings should be deferred until trial).


2. *To exclude evidence of Super X's decision not to rely on an opinion of counsel*, and 3. *To exclude argument or evidence of willful infringement occurring after February 2008, or in the alternative, after this lawsuit was filed.* I consider these motions together because they both relate to the issue of evidence directed to the issue of whether defendants' infringement, if proven, was willful.

*In Halo Electronics, Inc. v. Pulse Electronics, Inc*., 136 S. Ct. 1923 (2016), the Court dismantled the "unduly rigid," two-part test the Federal Circuit established in *In re Seagate Technology, LLC*, 497 F.3d 1360 (2007) (en banc), for determining when a district court may increase damages pursuant to § 284 of

the Patent Act. Under *Seagate*, "a plaintiff seeking enhanced damages must show that the infringement of his patent was 'willful'" using a two-part test that required both "objective recklessness" and "subjective knowledge." *Halo*, 136 S. Ct. at 1930. The *Halo* Court held that this test was incompatible with Congress's intent to grant district courts broad discretion to mete out punitive damages as a sanction for "egregious infringement behavior." *Id*. at 1932. Accordingly, it scotched the first prong of the analysis, noting that requiring objective recklessness "excludes from discretionary punishment many of the most culpable offenders," and held that "subjective willfulness...may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Halo*, 136 S. Ct. at 1933. Accordingly, while "objective recklessness" is no longer a prerequisite to enhanced damages under § 284, whether an infringer's infringing conduct was "willful" remains a relevant consideration.

"The ultimate question of willfulness has long been treated as a question of fact" for the jury. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003, 1006 (Fed. Cir. 2012). The Federal Circuit recently confirmed that *Halo* does not disturb this rule. *WBIP, LLC v. Kohler Co.*, --F.3d--, 2016 WL 3902668, at *15 (Fed. Cir. Jul. 19, 2016) ("[w]e do not interpret *Halo* as changing the established law that the factual

components of the willfulness question should be resolved by the jury.... Willfulness of behavior is a classical jury question of intent. When trial is had to a jury, the issue should be decided by the jury.").[4]

Bearing these principles in mind, I grant defendants' motion *in limine* to exclude evidence of Super X's decision not to obtain an opinion of counsel, and I deny their motion *in limine* to exclude evidence or argument of willful infringement after a particular date. As to the first, plaintiff does not dispute that an accused infringer has no affirmative duty to obtain advice of counsel, and that its failure to do so "does not give rise to an adverse inference with respect to willfulness." *Seagate* 497 F.3d 1360 (Fed. Cir. 2007) (citing *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1345-46 (Fed. Cir. 2004) (en banc)). Yet plaintiff

---

[4] In a footnote to this portion of text, the court explained that the Supreme Court declined in *Halo* to resolve whether there is a Seventh Amendment right to a jury trial on the issue of willfulness, concluding: "This leaves in place our prior precedent that there is a right to a jury trial on the willfulness question. Our case law is clear that in the absence of the Court overturning our established precedent that precedent remains in effect. *See, e.g., Masias v. Sec'y of Health & Human Servs.*, 634 F.3d 1283, 1288 (Fed. Cir. 2011) (citing *Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006)). Of course, this is not to say that a jury verdict of willful infringement ought to result in enhanced damages. Whether the conduct is sufficiently egregious as to warrant enhancement and the amount of the enhancement that is appropriate are committed to the sound discretion of the district court."

acknowledges that it seeks to use defendants' failure to obtain an opinion of counsel as one element to consider in determining whether defendants' infringement was willful. Plaintiff insists that *Knorr-Bremse* does not preclude advice of counsel evidence, and it cites two district court cases that have indeed held that an accused infringer's failure to obtain such advice may be considered as part of the "totality of the circumstances" when deciding whether infringement was subjectively willful. *See Tyco Healthcare Group, LP v. Applied Medical Resources Corp.*, No. 9:06-cv-151, 2009 WL 5842063, at *3 (E.D. Tex. Mar. 30, 2009); *Third Wave Techs. Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991 (W.D. Wis. 2005). But those cases are factually distinct for at least the reason that defendants' overarching narrative here is not that it believed in good faith that the accused products did not infringe the asserted patents, but rather that they believed they were entitled to engage in the infringing conduct. Because the evidence they seek to offer is primarily, if not exclusively, directed to this theory, the probative value of defendants' failure to obtain advice of counsel is minimal. Indeed, plaintiff argues that "advice of counsel is common in patent trials," but it makes no attempt to explain the relevance of advice of counsel evidence in *this* case. Accordingly, I conclude that the likelihood that the jury will draw an inappropriate adverse inference based on evidence that

defendants did not obtain advice of counsel outweighs any possible relevance of that evidence might have.

Defendants are not entitled, however, to an order precluding plaintiff from offering any evidence of defendants' conduct after either February 2008 or October 10, 2012 (the date case was filed), for the purpose of establishing willfulness. As to the first date, defendants' motion reflects an erroneous interpretation of my conclusion at summary judgment that "a reasonable interpretation of [certain evidence from February of 2008] is that Super X believed it could sell — and was, indeed selling — ballasts incorporating the parties' joint design to plaintiff's competitors." DN 349 at 24-25. Contrary to defendants' argument, I did not "acknowledge[] that Super X's belief was reasonable" as of February 2008. Mot. at 2. Instead, as the formulation of my statement makes clear, I concluded that *a reasonable jury could find* that Super X believed it was entitled to sell, and was selling, accused products. That is a far cry from drawing the legal conclusion that Super X's belief was "objectively reasonable" as of that date. Mot. at 3.

As for the later date, defendants argue that its post litigation conduct is "irrelevant" to willfulness because plaintiff failed to move for a preliminary injunction. This argument is unpersuasive and is not supported by the cases defendants cite.

4. *To exclude argument and evidence of Robertson's trade secrets.* This motion is denied. The evidence at issue is relevant to whether redesigned ballasts that Super X might have developed earlier if Super X had believed it was infringing the asserted patents was an "available" non-infringing alternative to the accused devices. This question is integral to plaintiff's claim for lost profits. Defendants' insistence that plaintiff is "trying to relitigate" whether defendants misappropriated plaintiff's trade secrets is misplaced. While I agree that it would be inappropriate to incorporate a mini-trial into whether Super X's use of the 2006 schematic amounted to a misappropriation of plaintiff's trade secret, plaintiff is entitled to offer evidence to support its argument that the hypothetical redesign Super X claims it would have developed was not "available" because is was based on a schematic that was designated "Highly Confidential Robertson-proprietary information." Whether that use of the evidence would violate the parties' settlement agreement in the related case is an issue that must be determined elsewhere, if at all.

5. *To exclude argument and evidence of the Manufacturing and Development Agreement.* This motion is denied for reasons similar to those stated above. Even assuming defendants are

correct that the MDA is irrelevant to patent infringement and validity, it appears from the parties' complex and extensively litigated damages arguments that the MDA is likely to be relevant to damages. Again, I will not allow a mini-trial on the MDA's enforceability, and I will entertain, in context, any objections defendants may raise with respect to plaintiff's use of the MDA evidence at trial. For example, in view of the parties' unresolved disputes over whether the MDA was a "supply" contract, and when the contract expired, I tend to agree with defendants that plaintiff may not use the MDA as support for arguments that assume these disputes would be resolved in plaintiff's favor, such as that Super X had a *legal obligation* "to supply the ballasts at issue" to plaintiff. As defendants acknowledge, however, appropriate jury instructions may be given to ensure that the jury does not consider the MDA for improper purposes.

6. *To preclude Robertson's damages expert, Mr. Carter, from presenting new damages opinions at trial.* To the extent this motion is not moot, it is granted. All appear to agree that Mr. Carter will not present opinions that "anyone other than Super X is a party to the hypothetical negotiation" used for purposes of determining a reasonable royalty, or that any third parties would have supplied plaintiff with ballasts sufficient to make

the sales it would have made but for defendants' (presumed) infringement. Accordingly, the portion of defendants' motion directed to those issues is denied as moot.

Defendants seek to preclude Mr. Carter from offering "an opinion on price erosion" on the ground that his report did not disclose such an opinion. At first blush, this request may also appear to be moot in view of plaintiff's representation that it will not elicit from Mr. Carter any opinion "that Robertson is entitled to compensation for reduced prices on the sales that *Robertson actually made*, such that Robertson would be entitled to additional damages on sales of *its own ballasts*." Pl.'s Opp. at 3 (original emphasis). I agree that Mr. Carter did not express that opinion in his report. Although he opined, as plaintiff points out, that plaintiff's weighted average annual sales prices could be considered "a lower bound, as decreased competition can permit producers to raise prices and increase profits," and that if the Customer Defendants' weighted average were used, plaintiff would be entitled to an additional $1.7 million "in lost sales," neither of these statements, nor any other portion of his report, discusses or quantifies any damages plaintiff may have suffered in the form of depressed sales prices on its own products as a result of defendants' competition. Plaintiff argues that it is entitled to present a price erosion theory of damages based on the testimony of lay

witnesses, citing *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 831 F. Supp. 1354, 1387 (N.D. Ill. 1993) (Easterbrook, J.) (patentee entitled to "establish price erosion theory through witnesses testifying from personal knowledge," even though experts "[did] not attempt to estimate either the price [the patentee] could have realized had there been less competition or the reduction in sales that a higher price would have caused."). While I agree that on its face, *Mahurkar* supports plaintiff's position, the Federal Circuit's later decision in *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.,* 246 F.3d 1336 (Fed. Cir. 2001), established that "a credible economic analysis" is required to establish "entitlement to a higher price," which must take account of "the effect of that higher price on demand for the product. In other words, the patentee must also present evidence of the (presumably reduced) amount of product the patentee would have sold at the higher price." *Id*. at 1357.

Neither Mr. Carter's general statement that "decreased competition can permit producers to raise prices and increase profits," nor his unadorned footnote to two microeconomic treatises supporting that statement, amounts to a "credible economic analysis" of the kind required to carry plaintiff's burden of proof on a price erosion theory, and nothing in plaintiff's opposition suggests how unidentified lay testimony

regarding "the pricing pressure that arose from Defendants' infringement" could possibly fill this analytical void. While it may be true that defendants could have raised this argument at summary judgment, plaintiff essentially concedes that Mr. Carter's opinion is insufficient to establish a price erosion theory of damages and neither identifies nor explains the lay testimony it claims can do so. In this context, I am persuaded that there is nothing to be gained from allowing plaintiff to suggest that Mr. Carter's opinion somehow supports a price erosion theory.

There is also merit to defendants' request to preclude Mr. Carter from opining about market share or about "two-supplier markets." Plaintiff acknowledges—as Mr. Carter himself did at his deposition—that he did not "perform any market share calculation to assess damages." The record also supports defendants' assertion that Mr. Carter did not identify a two-supplier market in his report or deposition, but instead discussed two "tiers" of suppliers. But Mr. Carter's definition of these "tiers" was both fluid and open-ended (for example, Tier 1 suppliers included "to some extent, GE," while Tier 2 included companies "such as" plaintiffs and some defendants, "among others."). As plaintiff's cited authority reveals, a patentee seeking to establish lost profits using the "two-supplier market test" must show, *inter alia*, that "the relevant

market contains only two suppliers." *Micro Chemical, Inc. v. Lextron, Inc.,* 318 F.3d 1119, 1124 (Fed. Cir. 2003).

Plaintiff's tortured attempt to distill Mr. Carter's various references in his report to Tier 1 and Tier 2 suppliers (none of which, I note, is in the brief section he devotes to the first *Panduit* factor—demand for the patented product—which is where plaintiff asserts that the two-supplier market theory is "significant"), into evidence that "the relevant market contains only two suppliers" is difficult even to grasp, and I have no trouble concluding that it is far more likely to confuse the jury than to help it. Whatever else Mr. Carter's analysis of Tier 1 and Tier 2 suppliers may show, it does not support the conclusion that the "relevant market contains only two suppliers," which, as noted above, is a prerequisite to proving lost profits on a "two-supplier market" theory. *Id.*


7. *To exclude lay opinion testimony from Robertson's CEO, Mr. William Bryant, on the market and third party manufacturing capacity.* This motion is denied. While it is true that as a lay witness, Mr. Bryant may offer only testimony based on his personal knowledge, it is reasonable to believe that, as Robertson's CEO, he has personal knowledge regarding at least some of the issues defendants identify in their motion. The foundational challenges defendants raise are best addressed at

trial, in the context of specific testimony plaintiff may seek to elicit from Mr. Bryant.

8. *To exclude testimony that products are* <u>not</u> *non-infringing alternatives where they allegedly infringe invalid or third party patents.* This motion is denied. The authorities plaintiff cites, including *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1340 (Fed. Cir. 2015), support plaintiff's argument that a product that appears, during the infringement period, to infringe a third-party patent (even if the alternative is later determined not to infringe that patent), may appropriately be considered "unavailable" to the infringer. For the argument with respect to proposed alternatives that infringe a patent that is later (i.e., after the infringement period) determined to be invalid, defendants cite *Commil USA, LLC v. Cisco Systems, Inc.*, 720 F.3d 1361, 1368 (Fed. Cir. 2013), for the unremarkable proposition that a product cannot infringe an invalid patent claim. But this "axiomatic" proposition, *id.*, on its own, does not settle the question of whether a proposed alternative that infringes a claim determined *after* the infringement period to be invalid can be considered available *during* the infringement period, and the rationale of *AstraZoneca,* as well as the basic presumption of patent validity, both counsel against defendants' interpretation.

9. *To exclude evidence and testimony regarding seven identified Atlas and Jademar ballasts.* This motion is denied. Defendants admit that the challenged products were included in plaintiff's infringement contentions. Further, contrary to defendants' argument that Dr. Roberts provided "no opinion regarding infringement" of these products, the portions of the record to which plaintiff points appear to support the conclusion that the Atlas and Jademar products infringe the asserted claims for the same reasons (e.g., they contain the same infringing component) as products about which Dr. Roberts did opine. Notably, defendants' reply brief appears to narrow the scope of their motion, arguing that Dr. Roberts cannot offer testimony that the Jademar ballasts infringe. While Dr. Roberts may not testify about opinions outside the scope of his report, to the extent he opines that certain products infringe the asserted claims, I see no reason at this juncture to prevent plaintiff from presenting other evidence to show that the Atlas and Jademar products plaintiff identifies in its infringement contentions, while not specifically addressed by Dr. Roberts, infringe for the same reasons Dr. Roberts cites because they either contain a component Dr. Roberts identified as infringing or are in fact the very same products Dr. Roberts analyzes.

*Defendants' Daubert motion to exclude the testimony of Victor D. Roberts on secondary indicia of non-obviousness.* This motion is denied. The secondary indicia about which Dr. Roberts opines are: commercial success; long-felt but unsolved need; copying of the invention by others; failure of others to solve the problem the problem the invention solved; and industry praise for the invention. Defendants argue that Dr. Roberts is unqualified to opine about commercial success because he is "a technical expert without experience or training in economics or business." DN 412 at 2. It is true that Dr. Roberts is a technical expert, but I am satisfied that his experience—which spans several decades of research and development work specifically in the lighting industry—provides a sufficient basis for him to offer the opinions he expresses on this issue in his responsive report, which: 1) quantify the success of the accused products (using information appropriately drawn from Mr. Carter's report, *see Apple Inc. v. Motorola*, 757 F.3d 1286, 1321 (Fed. Cir. 2014)) (experts "routinely rely upon other experts hired by the party they represent for expertise outside of their field"); and 2) provides evidence of the required "nexus" between the patented features and the commercial success of the products that embody them. *See generally Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed. Cir. 1998) (discussing patentee's burden to show a "nexus" between

commercial success and patented product, or for the patented
features "[w]hen the thing that is commercially successful is
not coextensive with the patented invention"). Specifically, in
his responsive report, Dr. Roberts summarizes how the accused
products practice the claimed features, cites the specific
portions of his opening report discussing defendants'
infringement of these features, and refers to specific pages of
Mr. Carter's report that discuss and identify evidence to
support a nexus between the patented features and the products'
commercial success (*see, e.g.*, Carter Rep. at p. 22 and notes
203-205; *id*. at p. 68 and notes 528-530.). In short, Dr.
Roberts's opinion on commercial success, although brief, is
neither outside his field of expertise nor is it conclusory.
Defendants' citation to *Rambus Inc. v. Hynix Semiconductor Inc.*,
254 F.R.D. 597 (N.D. Ca. 2008), is not to the contrary. *See id*.
at 604 (criticism of technical expert's qualifications "does not
impact [expert's] ability to testify about aspects of the
commercial success inquiry, like whether a product embodies a
claimed invention" and expert's testimony "could even aid the
jury in understanding the performance value provided by a
claimed invention."). I have reviewed defendants' objections to
Dr. Roberts's opinions on the remaining objective indicia and
conclude that are without merit for similar reasons and do not
merit individual discussion.

ENTER ORDER:

_____

Elaine E. Bucklo
United States District Judge

Dated: August 19, 2016